## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | |
| **DERMA PEN, LLC,** | : | Case No. 14-11894 (KJC) |
| | : | |
| Debtor | : | Re: docket nos. 95,179, 208 |

## MEMORANDUM[1]

## BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

On August 8, 2014, Derma Pen, LLC (the "Derma Pen" or the "Debtor") filed a

chapter 11 bankruptcy petition in this Court. Derma Pen is a provider of Class 1 FDA registered

micro needling and skin treatment devices and systems.[2] Derma Pen sold micro needling devices

and related products under the DERMAPEN® trademark.[3] At the time of the bankruptcy filing,

Derma Pen was embroiled in a lawsuit that it had filed in the United States District Court for the

District of Utah against 4EverYoung Limited ("4EY"), Stene Marshall d/b/a/ Dermapen World

("Marshall")[4] and others (the "Utah Litigation") regarding disputes related to a Distribution

Agreement executed by Derma Pen and 4EY.[5]

The record reveals that a company named Biopelle, Inc. ("Biopelle") was involved in a

---

[1]This Memorandum constitutes the findings of fact and conclusions of law required by Fed.R.Bankr.P. 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding pursuant to 28 U.S.C. 157(b)(1) and (b)(2)(A). The motion to dismiss this bankruptcy case is a core proceeding that "arises under" Bankruptcy Code §1112.

[2]Declaration of Jeremy Jones (D.I. 22), ¶ 4.

[3]*Id.* at ¶¶ 5 - 10.

[4]4EY and Marshall may be referred to jointly herein as the "Movants."

[5]Declaration of Jeremy Jones (D.I. 22), ¶¶ 16 -17.

joint venture with Derma Pen's affiliate, Medmetics, LLC.  Shortly after Derma Pen's

bankruptcy filing, the President and CEO of Biopelle, Elliott Millstein, wrote an email based

upon his conversation with Derma Pen's chief executive officer, Jeremy Jones.  The email was

sent to Biopelle's employees and sales agents:

> Many of you have heard the news that Derma Pen, LLC filed for Chapter 11 Reorganization on Friday, August 8.  You (or your customers) may have also received communication from Dermapenworld, LLC, a completely separate company and subsidiary of Equipmed [an affiliate of the Movants], regarding this filing.  Here are the facts:

> Derma Pen, LLC is the owner of the trade name "DermaPen" in the United States.  Equipmed is the owner of the same trade name in a number of other countries.  Derma Pen, LLC used to be affiliated with Equipmed and when they broke that affiliation, Equipmed formed its US subsidiary, Dermapenworld, to challenge Derma Pen's ownership of the trade name DermaPen.  This legal battle has been going on for over a year.

> As a strategy in fighting this legal battle, the partners of Derma Pen, LLC formed a new company, Medmetics, LLC, and have transferred most of the assets of Derma Pen, LLC to this new entity, including the ownership of the trademark.  But it has been their intention for some time to abandon the Dermapen trademark and develop a new, uncontested trademark.  The new company and its name were part of this strategy as well as creating a new trade name, MDerma FDS, for its new generation device.  **The bankruptcy filing was just another step in this strategy.**
> . . . .

(Ex. 1; emphasis added.)  The Debtor vigorously disputes the truth of the statements concerning

the Debtor's strategy, but based upon the record before me, I conclude that this email is the most

honest articulation of the Debtor's intentions.

The following motions are before the Court:

(1)    Motion of 4EverYoung Limited and Stene Marshall to Dismiss the Chapter 11 Bankruptcy Case Pursuant to Bankruptcy Code Section 1112(b) (D.I. 179) (the "Motion to Dismiss");

(2)    Motion of 4EverYoung Limited and Stene Marshall to Transfer Venue of this Chapter 11 Bankruptcy Case Pursuant to 28 U.S.C. §§ 1408 and 1412 and Bankruptcy Rule 1014 (D.I. 95) (the "Motion to Transfer Venue"); and

(3)    United States Trustee's Motion for Entry of an Order Converting or Dismissing the Chapter 11 Case (D.I. 208) (the "UST Motion to Dismiss").

Objections to the Motion to Dismiss and the UST Motion to Dismiss were filed by Derma Pen (D.I.s 224, 237) and Michael Anderer ("Anderer") (D.I.s 225, 239). Anderer is an owner of the Debtor, the Debtor's secured creditor and DIP lender, and the sole owner of Medmetics, LLC. Baker Donelson Bearman Caldwell & Berkowitz, PC, former counsel to Derma Pen in the Utah Litigation and an unsecured creditor in this case, also filed an objection to the Motion to Dismiss (D.I. 222). Derma Pen filed an objection to the Motion to Transfer Venue (D.I.s 133), which was joined by Anderer. (D.I. 136).

A combined evidentiary hearing on the foregoing motions was held on November 19, 2014 and December 1, 2014 (the "Evidentiary Hearing"). For the reasons set forth herein, the Motion to Dismiss and the UST Motion to Dismiss will be granted and the Motion to Transfer Venue will be dismissed as moot.

## FINDINGS OF FACT

(a)    The Sales Distribution Agreement

In July 2011, the Debtor and 4EY entered into a Sales Distribution Agreement (the "Agreement") pursuant to which 4EY granted the Debtor a right and license to distribute the Derma Pen Micro-Needling Skin Resurfacing System in the United States (the "Product"). (Ex. 9.) The term of the Agreement was two years from the Effective Date, with automatic renewals of one-year intervals, unless a notice of termination was provided by either party 60

3

days prior to the next renewal date. (Ex. 9 at § 11.1.) With respect to the DermaPen trademark, the Agreement provides that the Debtor owns the trademark rights to "DermaPen" in the United States (the "U.S. Trademark"), and 4EY owns the DermaPen Trademark in other parts of the world, including the United Kingdom. (Ex. 9 at § 12.1.) The Agreement also provides that, upon termination, the Debtor must offer the U.S. Trademark to 4EY, and 4EY has a right of first refusal to purchase that trademark. (Ex. 9 at § 12.2.) The parties agreed that the value of the U.S. Trademark would be determined by independent auditors, "of which one will be appointed by both parties." (*Id.*) If the parties fail to agree upon a price for the U.S. Trademark 30 days after appointment of the independent auditors, the parties agreed that value should then be judicially determined. (*Id.*) The parties further agreed that the Debtor owned the domain name "www.DermaPen.com," and that, upon termination, 4EY would have a similar right to purchase the domain name. (Ex. 9 at § 14.6).

By letter dated May 30, 2013, the Debtor's Chief Operating Officer notified 4EY that, pursuant to § 11.1 of the Agreement, the Debtor was exercising its right to terminate the Agreement effective upon expiration of the then-current term on August 1, 2013 (the "Termination Notice"). (Ex. 10.) On July 25, 2013, Marshall responded to the Debtor's Termination Notice by exercising 4EY's right to purchase the U.S. Trademark and domain name (the "July 25 Letter").[6] (Ex. 12.) The July 25 Letter also advises that 4EY had engaged KPMG in Salt Lake City to audit the Debtor and ascertain the value of the Trademark Assets, and, if the parties could not agree on a value by August 25, 2013, 4EY would file a law suit in the United

---

[6]The U.S. Trademark and the domain name are referred to jointly herein as the "Trademark Assets."

Kingdom to determine the value. (*Id.*) The July 25 Letter also states 4EY's position that the release of products utilizing the DermaPen logo and name without authorization was a breach of the Agreement and could be considered in assessing the value of the items. (*Id.*)

(b)    The Utah Litigation

Instead, on August 1, 2013, it was the Debtor that filed a complaint against 4EY, Marshall and others in the United States District Court for the District of Utah, Central Division (the "Utah District Court") asserting numerous claims, including fraudulent inducement, breach of contract, trademark infringement, unfair competition and others (the "Utah Litigation"). (Ex. 71.) The Debtor also filed a motion for temporary restraining order and preliminary injunction (the "TRO Motion") which was heard by the Utah District Court on October 24, 2013. Prior to the hearing on the TRO Motion, the Utah District Court Judge asked the parties to be prepared to address his concerns, including that the Debtor had not filed a copy of the Agreement and had not given any "exposition, explanation or argument of many central events in termination of the agreement and later correspondence." (Ex. 13.) On October 29, 2013, the Utah District Court Judge issued a memorandum decision and order denying the Debtor's TRO Motion (the "TRO Decision"), deciding, in part, that:

> Derma Pen has not established a substantial likelihood of success on the merits. Derma Pen terminated the Agreement. While the parties do not dispute that there is no automatic transfer of the United States Dermapen trademark or the Domain Name rights upon termination of the Agreement, 4EverYoung has the right to purchase those rights and has made attempts to do so, to which Derma Pen has been non-responsive. Derma Pen's rights in the trademark are waning and will be extinguished once 4EverYoung completes the purchase of the Domain Name and the United States Trademark rights to Dermapen.

> Additionally, for purposes of the narrow issue of trademark infringement, Section 12.1 of the Agreement does not clearly and unequivocally restrict

5

Defendants from using the Dermapen trademark in the United States during the term of the Agreement, and it certainly does not restrict Defendants from using the Dermapen trademark *after* termination of the Agreement. This case is not a case based simply on trademark rights under United States law. Rather, it is a contract case in which the Agreement between the parties governs the rights and obligations of the parties related to the Dermapen trademark in the United States. Derma Pen's purported trademark rights must be analyzed in the context of the Agreement; the Agreement cannot be ignored for purposes of Derma Pen's Motion.

(Ex. 72 at p. 4 - 5.) The Debtor filed an appeal of the TRO Decision.[7] (Ex. 74.)

The Utah Litigation was stayed in November 2013 because the Agreement provides that any dispute over the purchase price for the Trademark Assets should be resolved in the United Kingdom. (Ex. 9, §§ 12.2, 17.7.) At a hearing on April 17, 2014, the Utah District Court lifted the stay.[8] On May 1, 2014, the Debtor filed an Amended Complaint in the Utah District Court. (Ex. 73.) On May 2, 2014, 4EY, Marshall and the other defendants filed an answer to the Amended Complaint, counterclaim, third-party amended complaint and demand for a jury trial (the "Answer"). (Ex. 75.)

On May 15, 2014, in response to competing motions for temporary restraining orders filed by the parties,[9] the Utah District Court entered a memorandum decision and order

---

[7]After the Evidentiary Hearing, this Court received a copy of the opinion by the United States Court of Appeals for the Tenth Circuit, reversing the Utah District Court's TRO Decision regarding Derma Pen's likelihood of success, and remanding the matter to the Utah District Court to consider elements such as irreparable injury, balancing of the equities and the public interest in light of Derma Pen's continued trademark rights. *Derma Pen, LLC v. 4EverYoung Limited*, No. 13-4157 (10th Cir. Dec. 9, 2014).

[8]Utah Litigation, Case No. 2:13-cv-00729, D.I. 111 at 26.

[9]The Utah District Court noted that the parties had filed the following: (i) Defendants' Motion for Temporary Restraining Order and Preliminary Injunction (Utah D.I. 141), (ii) Derma Pen's Second Motion for Preliminary Injunction for Trademark Infringement (Utah D.I. 148), and (iii) Derma Pen's Motion for Preliminary Injunction for False Advertising and Related Claims (Utah D.I. 149). (Ex. 76.)

expediting the disposition of issues the Court believed to be fundamental to the parties' dispute:
(1) whether the Debtor could rescind the Agreement, and (2) if the Agreement is valid, whether
to grant preliminary relief regarding 4EY's claim compelling the sale of the U.S. Trademark.
(Ex. 76.)   The Court set an expedited schedule for discovery and trial of the Debtor's cause of
action for fraudulent inducement (which was the basis of its assertion of a right to the rescission
remedy), and of 4EY's claim that Derma Pen must comply with its post-termination obligation to
sell the Trademark Assets. (*Id.*)

On August 4, 2014, Utah District Court granted (for the most part) two motions filed by
4EY for partial summary judgment. (Ex. 87; Ex. 88.)  First, the Utah District Court decided that
several defenses barred the Debtor from asserting the equitable remedy of rescission.[10] (Ex. 87.)
Second, the Utah District Court reviewed the parties' undisputed facts and determined that those
facts did not support some of the Debtor's claims of misrepresentations by 4EY and Marshall.[11]
A jury trial was scheduled to begin on August 11, 2014, but the Debtor's chapter 11 filing on
August 8, 2014 stayed the trial.

(c)    The Bankruptcy Case

The Debtor's Bankruptcy Schedules show that, as of August 8, 2014 (the "Petition Date")

---

[10]The Utah District Court also rejected the Debtor's argument that a decision on the fraudulent
inducement claim had to be made prior to any decision on the remedy of rescission.  The Utah District
Court noted that the Debtor was left with its fraudulent inducement claim, but limited to a damages
remedy.  (Ex. 87, p. 17-18.)

[11]In particular, the Utah District Court determined that the undisputed facts did not support the
Debtor's claims that 4EY and Marshall made misrepresentations about product pricing and geographic
exclusivity related to their right to distribute the micro needling device.  (Ex. 88.)  The Court also
determined that claims based on misrepresentations about brand exclusivity failed under Fed.R.Civ. P.
9(b) because they were not asserted in the Amended Complaint. (*Id.*)  The Utah District Court
determined there was an issue of fact regarding the Debtor's claim based on the Movants'
misrepresentations about patent protection. (*Id.*)

the Debtor had the following creditors:

> (1)    one secured creditor - - Anderer - - who also is an insider of the Debtor, with a claim in the total amount of $580,284.90 secured by a lien against all assets of the Debtor (D.I. 56),
>
> (2)    26 priority tax creditors with claims in the total amount of $187,086.36 (D.I. 56), and
>
> (3)    36 unsecured creditors with claims in the total amount of $945,512.10. (Ex. 100, D.I. 129.)

Nine of the 36 unsecured creditors were owed more than $5,000, and ten of the unsecured creditors were owed less than $1,000. Two of the nine largest unsecured creditors were law firms representing the Debtor in the Utah Litigation (*i.e.,* Baker Donelson with a claim of $414,019.82 (or almost one half of the total amount of unsecured claims), and Durham Jones & Pinegar with a claim of $242,333.62). Another two of the nine largest unsecured creditors were CEO Jeremy Jones with a claim of $30,273.66, and Medmetics, LLC (a company owned by insider and secured creditor Michael Anderer) with a claim of $79,862.77. (Ex. 100.)

The Debtor's schedules list assets worth $6,203,011.97 (this total includes the Trademark Assets valued at $6 million) and total debt of $1,712,883.36. The first day hearing was held on August 26, 2014, at which time this Court (among other things) entered an interim order allowing the Debtor to use the cash collateral of secured creditor Michael Anderer for an interim period in accordance with an approved Cash Collateral Budget. (D.I. 36.)

Three days after the Petition Date, 4EY and Marshall filed an Emergency Motion for Relief from the Automatic Stay Pursuant to Bankruptcy Code Section 362(d)(1) (the "Stay Relief Motion"). (D.I. 8.) On August 26, 2014, the Debtor filed a Motion to Reject Executory Contract Entered Into By Derma Pen, LLC and 4EverYoung, Ltd. (the "Rejection Motion"). (D.I. 42.) A

hearing on the Stay Relief Motion and the Rejection Motion was held on September 12, 2014, at which the automatic stay was continued and the motions were taken under advisement.

On September 23, 2014, 4EY and Marshall filed the Motion to Transfer Venue, seeking to move the Debtor's chapter 11 bankruptcy case to the Utah District Court. (D.I. 95.)  On October 20, 2014, the Debtor filed a motion to approve (i) sale procedures in connection with a sale of substantially all of the Debtor's assets, (ii) scheduling an auction and hearing to approve the transaction and form and manner of notice, and (iii) procedures relating to the assumption and assignment of executory contracts (the "Sale Motion").[12] (D.I. 169.)  The Sale Motion is based on a stalking horse bid by insider and secured lender Anderer to purchase "substantially all of the Debtor's assets for the amount of $1,080,000, consisting of a credit bid of $530,000, plus cash in the amount of $550,000." (*Id.*).  At the Evidentiary Hearing, the Debtor acknowledged that it still did not have a signed asset purchase agreement from Anderer.  (Tr. 12/1/2014 at 32:15 - 17.)

    (d)    <u>Medmetics, LLC and Advanced Microneedling Systems</u>

On May 21, 2013, Medmetics, LLC ("Medmetics") was formed as a limited liability company in the State of Delaware.[13]  (Ex. 106.)  Medmetics is owned entirely by Anderer.  (Tr.

---

[12]4EY and Marshall also filed (1) a motion seeking standing to prosecute certain actions on behalf of the estate against Anderer and for other relief (D.I. 94), (2) a motion to compel certain discovery (D.I. 148), and (3) a motion to appoint an examiner (D.I. 182).  4EY and Marshall filed their Motion to Dismiss on October 28, 2014 and the United States Trustee filed the UST Motion to Dismiss on November 10, 2014.  Indeed, the animosity between the parties has been imported into the Delaware Bankruptcy Court, where the litigation survives as a two-party dispute evidenced by a plethora of motions, discovery fights and allegations of misconduct and fraud by each party against the other. With motion practice nearly running amok, I decided to hear or determine no other matters, whether already under advisement or yet to be heard, until resolution of the matters that are the subjection of the instant decision.

[13]On May 30, 2013, Derma Pen sent the notice terminating the Agreement.

12/1/2014 at 41:15 -19.)   Medmetics was formed to develop new micro needling products.  (Tr.

12/1/2014 at 7:13- 16; 18:8 - 20.)  Medmetics owns a new micro needling device known as the

MDerma.  (Tr. 11/19/2014 at 253:19 - 254:2.)  The Debtor, which does not have any research or

development staff and does not manufacture products, assisted in the development of MDerma

by providing feedback and information about the marketplace.  (Tr. 11/19/2014 at 254:3 - 15.)

On or about June 10, 2014, Medmetics and Biopelle, an unrelated Michigan corporation,

entered into a joint venture by forming Advanced Microneedling Systems, LLC ("AMS") for the

purpose of selling and marketing the new micro needling device and related skin care products.[14]

(Ex. 107.)  Medmetics contributed the micro needling device and Biopelle contributed the skin

care products to be sold with the device.  (Tr. 12/1/2014 at 8:21 - 9:13.)  Because there is a delay

in bringing the MDerma to market, AMS markets and sells a "CIT Special" for "early bird

purchasers" of MDerma, which provides a Dermapen device to the purchaser for use until the

MDerma device is available.   (Tr. 12/1/2014 at 14:4 - 23.)

Jones testified that Derma Pen did not transfer assets to Medmetics or AMS,

(Tr. 12/1/2014 at 12:7 - 17), but that there are "oral understandings" between Derma Pen and

Medmetics that grant Medmetics a "right to use" the U.S. Trademark  (*Id.* at 42:5 - 13) and

Derma Pen's marketing department (*Id.* at 42:17 - 20.)  Jones also testified that there is an oral

agreement prescribing the manner in which Derma Pen will be reimbursed by Medmetics for

contributing Dermapen devices to Medmetics for the CIT Special.  (*Id.* at 43:1 - 7.)  However,

indebtedness runs both ways between Derma Pen and Medmetics because, rather than buying

---

[14]Early marketing materials for AMS referred to it as a joint venture between Derma Pen and
Biopelle.  (Tr. 11/19/2014 at 176:13 - 177:19.)

directly from a manufacturer, Derma Pen has been using Medmetics as the source for purchasing

products.  (Tr. 12/1/2014, 54:2 - 55-7.)

DISCUSSION

The Bankruptcy Code provides that a court may dismiss a chapter 11 bankruptcy case for

cause. 11 U.S.C. §1112(b)(1).  The Third Circuit Court of Appeals has decided that:

> Chapter 11 bankruptcy petitions are "subject to dismissal under 11 U.S.C.
> §1112(b) unless filed in good faith and the burden is on the bankruptcy
> petitioner to establish [good faith]." *In re Integrated Telecom Express, Inc.,*
> 384 F.3d [108] at 118 [(3d Cir. 2004)] (citations omitted). "Whether the good
> faith requirement has been satisfied is a 'fact intensive inquiry' in which the
> court must examine 'the totality of the facts and circumstances' and
> determine where a 'petition falls along the spectrum ranging from the clearly
> acceptable to the patently abusive.'" *Id. (quoting In re SGL Carbon Corp.,*
> 200 F.3d [154], at 162 [(3d Cir. 1999)].

*In re 15375 Memorial Corp. v. BEPCO, L.P.*, 589 F.3d 605, 618 (3d Cir. 2009) (footnote

omitted).  "Once at issue, the burden falls upon the bankruptcy petitioner to establish that the

petition has been filed in 'good faith.'" *In re SGL Carbon Corp.,* 200 F.3d 154, 162 n.10 (3d Cir.

1999). *See also In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000) ("Once a party calls into

question a petitioner's good faith, the burden shifts to the petitioner to prove his good faith.")

To determine whether a chapter 11 petition is filed in good faith, a court should focus on

two factors: (1) whether the petition serves a valid bankruptcy purpose, and (2) whether the

petition is filed merely to obtain a tactical litigation advantage.  *Id.*

The Debtor asserts that it has filed its bankruptcy case for a number of valid bankruptcy

purposes.  First, the Debtor claims that it sought chapter 11 relief because of the ongoing expense

of the Utah Litigation, which was costing hundreds of thousands of dollars, and of other

11

litigation.[15] The Debtor claimed that it had to borrow money to pay some of its attorneys' fees. The Debtor filed the petition on Friday, August 8, 2014, just before a jury trial was scheduled to begin on Monday, August 11, 2014 in the Utah Litigation.

Second, the Debtor claims that it sought bankruptcy relief because it was faced with the prospect that the Utah District Court could order the Debtor to sell the Trademark Assets to 4EY at a price that was far less than the value the Debtor placed on those assets. The Debtor asserts that it filed the bankruptcy to take advantage of Bankruptcy Code provisions allowing the Debtor to reject the Agreement and sell the Trademark Assets by auction to the highest bidder and, indeed, as discussed above, it has taken steps to do so.

Third, the Debtor asserts that it filed the bankruptcy petition due to the possibility of an adverse action by the Food and Drug Administration (the "FDA"), which could prevent the Debtor from selling micro needling devices.

In response, 4EY and Marshall argue that the facts show clearly that the Debtor filed its bankruptcy petition solely as a litigation tactic. The Movants also argue that the Debtor did not have a financial need for bankruptcy protection as of the Petition Date. They contend that the Debtor has a relatively few number of unsecured creditors. They claim that, but for the attorneys' fees claims, debts to individual creditors are low, and that there is no evidence of any delinquency or that creditors were exerting unusual pressure on the Debtor to pay any past-due bills. Finally, 4EY and Marshall claim that evidence of the Debtor's bad faith is shown by fraudulent conduct engaged in by the Debtor both pre- and post-petition. Specifically, they assert

---

[15]The Debtor also filed an action in Florida styled *Derma Pen, LLC v. Equipmed USA, LLC*, No. 0:14-cv-60314 (S.D. Fla.). Equipmed USA is related to 4EY and Marshall, so the Florida litigation involves similar parties to the Utah Litigation.

that the Debtor has been transferring assets and business opportunities to Medmetics. They also

claim that the Debtor engaged in misconduct in connection with the FDA Audit.

Unquestionably, Derma Pen's bankruptcy filing was timed to stop the Utah Litigation

with the further purpose of moving the dispute to what the Debtor perceived as a "friendlier"

forum for disposition of the same issues pending before the Utah District Court. There is no

dispute that the petition was filed shortly after the Utah District Court found in favor of the

Movants and against the Debtor on two motions for partial summary judgment. It was also filed

one business day prior to the start of a jury trial. Further, at the time of the filing, the parties also

expected that the Utah District Court would soon issue rulings on two additional motions for

partial summary judgment that had been filed by 4EY and Marshall.   In a statement issued to

customers and others, Derma Pen wrote:

> Derma Pen, LLC filed for bankruptcy to protect the value of its assets and
> interest[s] including its trademark and domain name.
> . . . .
> The bankruptcy filing became necessary after more than fourteen months of
> extensive litigation surrounding the intellectual property of the Dermapen® brand
> and Derma Pen, LLC's continued ownership of it (USPTO Registration Number
> 4096295).  Due to the ongoing costs of these proceedings, our executive leadership
> decided that it was in our best interest to file bankruptcy to protect our rights, assets
> and interests.

(Ex. 25.)  Clearly, the Debtor filed its petition to stay the Utah Litigation pursuant to Bankruptcy

Code §362.  The Third Circuit Court of Appeals has decided that "[t]he protection of the

automatic stay . . . is not *per se* a valid justification for a Chapter 11 filing; rather, it is a

consequential benefit of an otherwise good faith filing." *15375 Memorial*, 589 F.3d at 620

quoting *In re Integrated Telecom Express, Inc.,* 384 F.3d 108, 128 (3d Cir. 2004).  "[C]ourts

universally demand more of Chapter 11 petitions than a naked desire to stay pending litigation,

and any perceived benefit of the automatic stay, without more, cannot convert a bad faith filing to

a good faith one." *Id.* (internal quotation marks omitted).  On its own, filing to stay the Utah

Litigation cannot support a good faith filing here. The Third Circuit Court of Appeals has

observed:

> It is easy to see why courts have required Chapter 11 petitioners to act within the scope of the bankruptcy laws to further a valid reorganizational purpose. Chapter 11 vests petitioners with considerable powers - - the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc. - - that can impose significant hardship on particular creditors. When financially troubled petitioners seek a chance to remain in business, the exercise of those powers is justified. But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code.

*SGL Carbon,* 200 F.3d at 165-66.

The Debtor argues that this bankruptcy will allow it retain value that will be lost outside

of the bankruptcy by utilizing Bankruptcy Code sections 365 and 363 to reject the executory

contract with the Movants and sell the Trademark Assets to the highest bidder.[16]  In *In re PPI*

*Enter. (U.S.), Inc.,* 324 F.3d 197, 211-12 (3d Cir. 2003), the Third Circuit affirmed a bankruptcy

court's decision that it was not "bad faith" for the debtors to file a bankruptcy case to avail

themselves of certain rights granted in the Bankruptcy Code. *Id.*  In that case, the bankruptcy

court found that "the primary purpose of the petition was to cap [a landlord's] claim pursuant to

§502(b)(6)." *Id.* at 211 quoting *In re PPI Enter. (U.S.), Inc.*, 228 B.R. 339, 343 (Bankr. D.Del.

1998).  The Third Circuit wrote "[t]he Bankruptcy Court also noted that [PPI] filed its

Chapter 11 petition in an attempt to divide its assets during the dissolution of its parent company.

The Court found this an appropriate use of Chapter 11 since the Code clearly contemplates

---

[16]"To say that liquidation under Chapter 11 maximizes the value of an entity is to say that there is some value that otherwise would be lost outside of bankruptcy." *Integrated Telecom,* 384 F.3d at 120.

liquidating plans under 11 U.S.C. §1123(b)(4), whereby a debtor may develop a Chapter 11 plan to sell off all of its assets." *Id.*

The filing of a chapter 11 petition to take advantage of rights provided by the Bankruptcy Code was explored more thoroughly in *Integrated Telecom*. The debtor in *Integrated Telecom* was liquidating under state law, but was unable to negotiate an accord and satisfaction with its landlord regarding a claim under a ten-year lease. *Integrated Telecom,* 384 F.3d at 113. The debtor then filed a chapter 11 petition to cap the landlord's $26 million claim at $4.3 million pursuant to Bankruptcy Code §502(b)(6). *Id.* at 116. At the time of the chapter 11 filing, the debtor listed assets of $105.4 million in cash and $1.5 million in other assets on its schedules. *Id.* at 115. In addition to the landlord's claim for $26 million, the debtor listed other liabilities of $430,000.00. *Id.* At the time of the filing, the debtor was a defendant in a securities class action that asserted claims of $93.24 million, but in its liquidating plan, the debtor proposed a $5 million reserve which, when added to $20 million in insurance coverage, limited a potential judgment to $25 million. *Id.* at 116. The securities class voted in favor of the plan, but the landlord objected and also moved to dismiss the case as a bad faith filing. *Id.* The bankruptcy court, relying in part on *PPI*, denied the motion to dismiss the case, and the landlord appealed. *Id.*

The Third Circuit noted the "truism" that "it is not bad faith to seek to avail oneself of a particular protection in the Bankruptcy Code - - Congress enacted such protections with the expectation that they would be used." *Id.* at 127 citing *In re James Wilson Assocs.,* 965 F.2d 160, 170 (7ᵗʰ Cir. 1992). However, "the far more relevant question is whether a desire to take advantage of a particular provision in the Bankruptcy Code, standing alone, establishes *good*

15

faith. We hold that it does not." *Id.* (footnote omitted; emphasis in original). The Court decided that the debtor ("Integrated") was not in financial distress when it filed, finding that it had no significant debt apart from the landlord's claim and that the securities action was not a threat to Integrated's finances, based on the estimated value of the claims and available insurance. *Id.* at 129. The Third Circuit decided that the "absence of any financial distress" distinguished *Integrated Telecom* from *PPI. Id.* at 122. The Court determined, therefore, that Integrated's chapter 11 petition was not filed in good faith "as it could not - - and did not - - preserve any value for Integrated's creditors that would have been lost outside of bankruptcy." *Id.*

Derma Pen claims that it filed chapter 11 in an effort to take advantage of Bankruptcy Code sections that might allow it to reject the Agreement and sell its Trademark Assets to the highest bidder via a bankruptcy auction. This position, of course, presupposes that a judicial determination of value by the Utah District Court in the context of that litigation would not yield a fair value for the Trademark Assets. Exposing assets to a market or sale process is often desirable. I am unwilling, however, to accept the proposition that the Utah District Court would be inadequate to the task of determining a fair valuation of the Trademark Assets.

The record here does not demonstrate that Derma Pen was in financial distress at the time of its filing. Its schedules indicate the Debtor was solvent, listing assets worth $6,203,011.97, and total debt of $1,712,883.36.[17] However, "it is well established a debtor need not be insolvent

---

[17]Jones testified that the Debtor obtained an appraisal of the Trademark Assets, which provided that the worst case valuation was $1.5 million, the "likely case" was $4.5 million, and the best case was $9.5 million. (Tr. 11/19/2014 at 101:1 - 102:2). However, the Debtor's stalking horse bid from Anderer is in the amount of $1,080,000, consisting of a credit bid of $530,000, plus cash in the amount of $550,000. (D.I. 169.) At the time of hearing on the motions before me, the Debtor acknowledged that it did not yet have a signed asset purchase agreement for this bid. (Tr. 12/1/2014 at 32:15 - 17.)

16

before filing for bankruptcy protection." *SGL Carbon,* 200 F.3d at 163. While "drafters of the Bankruptcy Code understood the need for early access to bankruptcy relief to allow a debtor to rehabilitate its business before it is faced with a hopeless situation . . . such encouragement . . . does not open the door to premature filing, nor does it allow for filing of a bankruptcy petition that lacks a valid reorganizational purpose." *Id.*

Closer examination of the schedules reveals that the Debtor lists 36 unsecured creditors, of which only nine are owed more than $5,000. Further, included in the $945,512.10 of unsecured debt is $117,770.35 owed to insiders Jeremy Jones, Anderer and Anderer's company, Medmetics. Except for the rising litigation costs (the lion's share of its general unsecured debt), there is no indication that the Debtor's operations were suffering from financial stress.[18]

Finally, the Debtor also argues that it filed to avoid the damage that could be caused if the FDA, as a result of the audit, issues an adverse action that could prevent the Debtor from selling micro needling devices. This does not demonstrate a valid purpose for filing bankruptcy. I can perceive no basis, and the record supports none, that the automatic stay would preclude such an action by the FDA *See* 11 U.S.C. §362(b)(4) (excepting the exercise of a governmental unit's police or regulatory power from the automatic stay).

I conclude that the totality of the facts and circumstances of this case support a determination that Derma Pen's bankruptcy petition was filed as a litigation tactic, rather than as a good faith attempt to reorganize or preserve value for creditors. Derma Pen filed the complaint that started the Utah Litigation and the Utah District Court was addressing the numerous claims.

---

[18]Although the litigation costs must be considered in this analysis, in this case, filing to avoid the mounting litigation costs falls more on the side of a litigation tactic rather than a need to reorganize. Here, the Debtor has merely exchanged its litigation costs for administrative costs in bankruptcy.

When the Utah District Court entered preliminary rulings that were not in Derma Pen's favor, Derma Pen filed a bankruptcy petition. The timing of the petition, and the lack of facts demonstrating that Derma Pen was in financial distress at that time, indicate that the bankruptcy petition was filed to avoid the expense of trial and the possibility of additional rulings against it.[19] The bankruptcy filing is an improper attempt by the Debtor to re-start the contract and trademark battle with the Movants in a new court. Rather than filing to assuage operational difficulties and financial stress caused by the trademark dispute, Derma Pen's petition is an attempt to disrupt the litigation process. The Debtor has failed to meet its burden that its chapter 11 petition was filed in good faith.

CONCLUSION

For the foregoing reasons, the Motion to Dismiss and the UST Motion to Dismiss will be granted. The Motion to Transfer Venue will be dismissed as moot. An appropriate order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: December 19, 2014

---

[19]The recent decision by the Tenth Circuit in Derma Pen's favor further demonstrates that the contract and trademark dispute should be resolved by the Utah District Court.